UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
ELENO MORALES,

                Petitioner,

                                            **MEMORANDUM & ORDER**
     -against-                                     12 CV 4584 (RJD)

THOMAS LAVALLEY, Superintendent,
   Clinton Correctional Facility,

                Respondent.
------------------------------------------------------x
DEARIE, District Judge.

      Following a 2008 jury trial in the County Court of Suffolk County, petitioner Eleno Morales was convicted of second-degree murder, and sentenced to 25 years to life, for the 1996 execution-style killing of his business partner Mauricio Lazo. Before the Court is his pro se application for habeas relief pursuant to 28 U.S.C. § 2254 in which he advances four claims: (i) the un-Mirandized statements he made during his first 48 hours in police custody should have been suppressed; (ii) the admission of the prior consistent statement of a key prosecution witness was error; (iii) the evidence of his guilt was not legally sufficient; and (iv) his sentence was harsh and excessive.

      For the reasons set forth below, the application is denied in all respects and the petition is dismissed.

## BACKGROUND

**The Shooting of Mauricio Lazo**

      Prosecution witness Maria Membreno, the Lazo family's live-in babysitter, testified that at approximately 6:00 p.m. on November 20, 1996, there was a knock on the front door of

Lazo's Brentwood home. At the time, Mauricio Lazo was in his basement office, while Membreno, Lazo's wife Mercedes and the two young children were in another room. Membreno, with a child in her arms, went to the door and saw petitioner through the window; she knew him as a friend of Lazo's who had been to the house about six times before. Petitioner pushed the door open, shoved Membreno, and went quickly to the basement. He appeared to be holding something under his jacket.

Membreno went back to the children's room to alert Mercedes to petitioner's unusual arrival. Fifteen minutes later, Membreno heard three shots and returned to the living room, where she saw petitioner emerge from the basement carrying a long, rifle-like weapon. Membreno asked petitioner whether he had shot Lazo; in response, petitioner raised a finger to his lips, said "shhhh," pointed the rifle at Membreno, and left. Membreno observed paper in his back pocket that she thought might be travel tickets.

Membreno told Mercedes what happened and she, in turn, telephoned the police. While on the call, she walked down to the basement, with Membreno accompanying her. The two women saw Lazo laid out, not breathing, with his head "all outside" and "open." The responding police officers reported finding "a horrific scene," with the victim's "brains . . . pretty much blown out of his head" and blood and brain matter in "a couple of different areas" of the room. The autopsy reported that Lazo suffered five gunshot wounds, including a head-injury inflicted at point-blank range.

An authorized search of petitioner's nearby home produced court papers petitioner had recently filed against Lazo to recover $17,000 allegedly invested in a joint business venture.

**Petitioner's Statements**

Petitioner evaded law enforcement until 2007, when the United States Marshals Service

(USMS) located him in Horry County, South Carolina, and then assisted local and New York authorities in arranging his arrest through a traffic stop. The particulars were adduced principally through the testimony of Suffolk County Detective Vincent Stephan at a pre-trial suppression hearing and again at trial. On December 3, 2007, Horry County police, in marked vehicles, stopped petitioner in Little River, South Carolina. Horry County Officer Derrick Suggs advised petitioner he was under arrest pursuant to a Suffolk County (New York) warrant. Suggs did not read petitioner his Miranda rights or question him. Detective Stephan asked petitioner his name and he responded "Juan something." Stephan also told petitioner that "he was under arrest for murder" and that he (Stephan) "was from New York."

The following ensued:

Q. After you told [petitioner] that you were from New York and he was being arrested for murder, what, if anything, did the defendant say…?

A. [He] said, "Yes, I know it's about Mauricio."

Q. Did you prompt him in any way to give that response to you?

A. No, I did not. . . .

Q. After [petitioner] had told you his name was Juan did you ask him anything else about his name?

A. After he said it's about Mauricio, I asked him what his name was again. . . . He said Eleno Vanegas Morales. He then said, "I knew this was going to happen. I tried to fix it in other ways; I went to the police, the church and I tried to talk to him." When he said that he was looking down . . . *A defense objection was sustained)*

Q. . . . with regard to after he made these statements to you how did he physically appear?

A. He was looking down at the ground and appeared deflated. (H. 17-18).

On cross-examination, Stephan elaborated: petitioner appeared "[e]motionally deflated.

3

Looking down. Shoulders down. In that type of body language." Stephan also added that petitioner "spoke in very understandable English."

Suggs then drove petitioner and Stephan a short distance to a highway Welcome Center, where petitioner was transferred to Stephan's rental vehicle. Stephan coordinated matters with local police while petitioner remained in the vehicle with Stephan's Suffolk County colleague, Detective Paul Dodorico. The two did not converse. After nearly an hour, petitioner asked to use a telephone to call his girlfriend to look into the matter of his catering truck and pending deliveries. Stephan offered petitioner use of a phone with the caveat that he conduct his call in English "[f]or safety reasons so we knew what he was saying in that he didn't plan an escape of some sort." With both detectives in the car with him, petitioner then telephoned Carmela Valada Garcia. During the call petitioner said to Garcia, without police prompting, "The police go get me, I'm going to jail," "Maybe I won't come back from jail," and "I come back maybe in one month, one year or in a hundred years." Stephan took contemporaneous notes of these remarks.

The following day (December 4, 2007), upon learning that petitioner had waived a hearing on extradition, Stephan and Dodorico retrieved petitioner from the Horry County jail (where he'd spent the night) and drove him to the airport for a flight back to New York. They did not initiate any conversation. At some point during the ride, petitioner asked to use a telephone; Stephan supplied his department-issued cell phone and instructed petitioner to speak in English.

Petitioner first called "a business associate named Ray Harris" (later identified as Ray Hardee) and told him, "I did something very bad a long time ago; I'm very sorry." Approximately fifteen minutes later, petitioner telephoned his landlady and told her, in substance, "Twelve years ago I had a big problem," "they were looking for me for a long time,

4

come and get me yesterday," and "I'm going back—I'm going to New York . . . that's where I had the problem." During these calls, petitioner appeared "[s]ober and alert" and "very" coherent. Stephan was driving so Dodorico took notes.[1]

At the airport, Stephan asked petitioner a series of pedigree questions pre-printed on an arrest worksheet. Stephan testified: "When I asked him about his marital status he said in sum and substance, 'No, never married, I didn't get married or have a family because of this.' . . . 'I knew this was going to happen' is what he finished up by saying." Stephan also asked petitioner "[h]ow many children he had;" petitioner responded, "I have one daughter Sandra with Naomi Bonilla; she lives in Brentwood." He added, without prompting, "She knows, I tell her." Stephan did not ask petitioner what he meant. As Stephan gathered his paperwork, petitioner said to him "in sum and substance, 'What happens to me now; I'm guilty; what I did was very bad; what now.'" Stephan replied that petitioner would be seeing a judge the next day and could address the matter then.

On cross-examination, defense counsel returned to Stephan's testimony that petitioner appeared "deflated" at the time of arrest and asked whether, on his second day in custody, petitioner was "still in that state of deflation or depression." The court overruled the prosecution objection to the word "depression" and Stephan answered: "I never used the word depressed. . . But my characterization of his deflated body language was from December 3, the scene of the arrest. On December 4 during the entire day he was quite friendly, conversational with us. Kind of jovial for being in [the] situation he was in. So, no, he was fine. . . . In very good spirits in my

---

[1] When testifying to these same events at trial, Stephan stated that petitioner said, "Twelve years ago I had some problems. They were looking for me for a long time and found me yesterday. I go back to New York because what I do is in New York."

opinion."

Because Stephan consulted Dodorico's notes while testifying, defense counsel asked, "[n]ow do you recall independently without relaying [sic] to Detective Dodorico's notes what was said by [petitioner]." Stephan replied, "I've reviewed those notes for preparation here. So from independent recollection. I knew sum and substance what he said." Counsel pressed: "Independent of that review did you recall the verbiage or did that refresh your recollection?" Stephan replied: "It helped refresh my recollection, but I did have sum and substance of what he said in my head."[2]

**The Hearing Court's Findings**

Ruling from the bench at the close of testimony and legal argument from counsel, the court announced that, "for purposes of the issues of fact that are being resolved at this hearing," the court was "fully accrediting [sic] the testimony" of Detective Stephan. The court denied the motion to suppress in its entirety, as follows:

> the Court finds that the statements attributed here to [petitioner] by Detective Stephan were in fact made with genuine spontaneity, [and] were not the result of inducement, provocation, encouragement or acquiescence. The Court finds that the People have established the voluntariness of these statements under these circumstances by proof beyond a reasonable doubt. The Court further finds that . . . some of the statements attributed to [petitioner] were in response to pedigree inquiries . . . about his name and later as part of a response involving marital status, the Court would note that such routine questions concerning name, age, address and the like do not need to be preceded by Miranda warnings and these questions do not constitute prohibited interrogation. . . .

---

[2] Stephan's trial and hearing accounts of the relevant events are essentially the same. The state also called the recipient of one of petitioner's telephone calls, Ray Hardee (Dodorico's notes and Stephan's testimony had named him as Ray or Roy Harris). Hardee testified to their business relationship (petitioner delivered sandwiches to job sites and at his request, the trucks were in Hardee's name) and the December 4 phone call he received from petitioner; he recalled that petitioner told him he had "done something bad" and "was on [his] way to New York."

6

The statements overheard during petitioner's telephone calls, the Court further ruled, "were made directly in the officer's presence where that was clear to [petitioner]" and "were not as [sic] the result of police questioning."

In a supplemental written decision issued after the hearing was reopened on grounds not relevant here, the court found that video recordings of the arrest, captured by cameras on two of the police units at the scene, "completely support[s] [Detective Stephan's] version of events." The court also wrote that its earlier ruling on the admissibility of petitioner's statements "stands." ECF Doc. 17 at 3.

**Appellate Finding of Voluntariness**

Unanimously affirming petitioner's conviction and sentence, the Appellate Division, Second Department, held that "the County Court properly concluded that [petitioner]'s statements were voluntary and that [petitioner] spoke with genuine spontaneity and not as the result of inducement, provocation, encouragement or acquiescence, no matter how subtly employed." People v. Morales, 89 A.D.3d 1111, 1111 (2d Dep't 2011) (internal quotations, citations, and alteration omitted), lv. app. denied, 18 N.Y.3d 926 (2012). [3]

## DISCUSSION

**I.  GENERAL STANDARDS OF FEDERAL HABEAS REVIEW**

Section 2254 in not a vehicle for re-litigating appeals. Its invocation is proper only by a prisoner who can show that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254 (a). When the claims advanced have already been

---

[3] Additionally, the jury that convicted petitioner was charged that, in order to consider any of his statements as evidence, they had to find that, beyond a reasonable doubt, that the statement was "spontaneously volunteered." (Trial Transcript 1391).

7

adjudicated on the merits in state court, relief "shall not be granted . . . unless the adjudication of the claim – (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d) (as amended by the Antiterrorism and Death Penalty Act of 1996 ("AEDPA")). The statute "erects a formidable barrier to federal habeas relief," Burt v. Titlow, __ U.S.__, 134 S. Ct. 10, 16 (2013), and does so in furtherance of "a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights . . . and are presumptively competent[] to adjudicate claims arising under the laws of the United States." Id. at 15.

The requirements of section 2254(d)(1) and (2) are strictly construed: the "contrary to" and "unreasonable application" clauses of paragraph(d)(1) mean that, when advancing a claim of legal error, a federal habeas applicant must show that the state court, in rejecting his claim, either "directly contradict[ed] a holding of the Supreme Court," Evans. v. Fischer, 712 F.3d 125, 132 (2d Cir.) (internal quotation and citation omitted), cert. denied, __U.S. __, 134 S. Ct. 238 (2013), or considerably misapplied an explicitly on-point Supreme Court holding. Burt, 134 S. Ct. at 16 (prisoner must "show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement") (internal quotation, citations and alterations omitted). For claims of "unreasonable determination[s] of the facts" under paragraph (d)(2), the prisoner bears the additional burden of "rebutting the state court's factual findings 'by clear and convincing

8

evidence.'" Id. (quoting 28 U.S.C. § 2254(e)(1)).[4] Further, the "presumption of correctness afforded to state courts' factual findings is particularly significant when those factual findings concern credibility issues because 'the federal habeas corpus statute gives federal habeas courts no license to redetermine [the] credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.'" Abraham v. Lee, 2014 WL 3630876, at * 7 (S.D.N.Y. July 22, 2014)") (quoting LaTorres v. Walker, 216 F.Supp.2d 157, 167 (S.D.N.Y. April 12, 2000)).

The Supreme Court has made clear that, "[i]f this standard is difficult to meet—and it is—that is because it was meant to be," since federal courts "will not lightly conclude that a State's criminal justice system has experienced the extreme malfunction for which federal habeas relief is the remedy." Id. (internal quotations, citations and alterations omitted).

## II. ANALYSIS OF PETITIONER'S CLAIMS

### A. Petitioner's Challenge to the Admissibility of His Statements

The Court readily concludes, as did the hearing and appellate courts, that petitioner's statements were voluntary. Indeed, the record shows them to have been so obviously spontaneous that little discussion is required to dispose of petitioner's claim. This Court has no authority to reassess the credibility of Detective Stephan, and petitioner has offered no evidence suggesting police trickery, coercion, or misconduct. The Constitution therefore requires no further inquiry. See Miranda v. Arizona, 384 U.S. 436, 478 (1966) ("Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our

---

[4] Both the Supreme Court and the Second Circuit have declined to address the relationship between subsections (d)(2) and (e)(1). See Burt, 134 S. Ct. at 15; Garguilio v. Heath, 586 Fed. App'x 764, 766 n. 1 (2d Cir. Oct. 10, 2014).

9

holding today"); Rhode Island v. Innis, 446 U.S. 291, 299 (1980) (same); Arizona v. Mauro, 481 U.S. 520, 529 (1987) (same); Pennsylvania v. Muniz, 496 U.S. 582, 589 (1990) (same). Because the record is devoid of even a scintilla of evidence suggesting police coercion, petitioner's attempt to cast the relevant events as the "functional equivalent of interrogation" under Innis and its progeny is fanciful at best. Cf., e.g., Innis, 446 U.S. at 303 (although officers' suggestive conversation "struck a responsive chord," it was error to equate such "subtle compulsion" with "interrogation"); Mauro, 481 U.S. at 528 ("[o]fficers do no interrogate a suspect simply by hoping that he will incriminate himself"). [5]

### B. The Admission of Membreno's Prior Consistent Statement

On cross-examination, the defense established that two details in Membreno's direct testimony—that petitioner "sshed" her when she asked what he had done and pointed the rifle at her—were missing from the account she initially gave police. But Membreno had included those details in grand jury testimony given a year before the trial, and the court allowed the prosecution to introduce that testimony as rehabilitation. The defense objection was that the consistent grand jury statement did not pre-date the claim of recent fabrication (presumably, the

---

[5] It is not clear whether petitioner is also invoking the *federal* Sixth Amendment. The Court need not address the possibility, however, nor must it grapple with the reach of proffered caselaw suggesting that the *federal* Sixth Amendment right might attach earlier in New York prosecutions than elsewhere. Even if the Sixth Amendment were implicated here, it would not be offended. See e.g., United States v. Edwards, 342 F.3d 168, 182 (2d Cir. 2003) ("Sixth Amendment protection extends to situations that look like government interrogations;" no violation occurs, even after request for counsel, if defendant "proceeds to make incriminating statements without any prompting or questioning" by law enforcement) (internal quotations and citations omitted). Cf. People v. Harris, 57 N.Y.2d 335, 342 (1982) (under New York law, "statements made by a defendant who has invoked the right to counsel may nevertheless be admissible at trial if they were made spontaneously"), cert. denied, 460 U.S. 1047 (1983).

influence of the district attorney). The Appellate Division found that the trial court erred by admitting the grand jury testimony but also held that the error was harmless because "there was overwhelming evidence of [petitioner's] guilt" and "no significant probability that the error contributed to the . . . conviction." Morales, 89 A.D. 3d at 1111.

This claim is entirely a matter of state law not cognizable on federal habeas. See Estelle v. McGuire, 502 U.S. 62, 67–68 (1991) (reaffirming that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"). To the extent petitioner has invoked the federal constitution by a perfunctory citation to the Fourteenth Amendment, he nevertheless has not shown, nor could he, that the Appellate Division's affirmance of his conviction in the face of that evidentiary error is contrary to or an unreasonable application of a specific Supreme Court holding. In any event, the error was indeed harmless under the applicable habeas standard, see Brecht v. Abrahamson, 507 U.S. 619, 635–37 (1993), because regardless of the disputed testimony, the cause of Lazo's death was undisputed and Membreno's identity of petitioner as the shooter was unwavering.

**C.      Sufficiency**

The Appellate Division concluded that petitioner failed to preserve his sufficiency claim, but also found, in any event, that "the evidence was legally sufficient to establish [petitioner's] guilt beyond a reasonable doubt." Morales, 89 A.D.3d at 1111. The sufficiency claim, therefore, is procedurally barred from habeas review, notwithstanding the appellate court's election to reach the merits in the alternative. See, e.g., Martinez v. Ryan, __ U.S. __, 132 S. Ct. 1309, 1316 (2012) (federal courts must not review a question of federal law where the state court decision on that claim rests on an independent and adequate state law ground); Murden v. Artuz, 497 F.3d 178, 193 (2d Cir. 2007) (New York's preservation requirement is a firmly established rule

11

sufficient to invoke the "independent and adequate state law ground" bar); Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990) (bar applies "even where the state court has also ruled in the alternative on the merits of the federal claim.").[6]

In any event, the strength of the prosecution's case at trial speaks for itself. Petitioner therefore cannot show that the Appellate Division's sufficiency determination is factually unreasonable within the meaning of Section 2254(d) or contrary to or an unreasonable application of the Supreme Court law. See Jackson v. Virginia, 443 U.S. 307, 324 (conviction must stand if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt").[7]

### D. Sentencing

The Appellate Division found that petitioner's sentence was not excessive. Morales, 89 A.D.3d at 1111. That conclusion is not contrary to or an unreasonable application of the holding of any Supreme Court case. Indeed, because petitioner's indeterminate sentence of twenty-five years to life is within the range authorized by New York law,[8] his sentencing claim does not

---

[6] The "independent and adequate state ground" bar may be bypassed where a petitioner demonstrates "cause and actual prejudice" for failing to comply with the state rule, or that a lack of federal review will result in a fundamental miscarriage of justice. Harris v. Reed, 489 U.S. 255, 262 (1989); Wainwright v. Sykes, 433 U.S. 72, 87 (1977). No such claim is made here.

[7] Petitioner also challenges his conviction as against the weight of the evidence, a species of review that exists only under New York law, see N.Y. Criminal Procedure Law § 470.15(5), so the claim is not cognizable here. Garrett v. Perlman, 438 F.Supp.2d 467, 470 (S.D.N.Y. 2006).

[8] See N.Y. Penal Law §§ 125.25(1) (second degree murder is a Class A-1 felony) and 70.00 (minimum range for indeterminate sentence for A-1 felony is 25 years, maximum is life).

present a cognizable habeas issue. See, e.g., Cooke v. Graham, 2009 WL 3111790 at *9 (E.D.N.Y. 2009) ("No federal constitutional issue is presented where . . . the sentence is within the range prescribed by state law") (quoting White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992)).

## CONCLUSION

For the reasons discussed, Eleno Morales's application for relief under 28 U.S.C. § 2254 is denied in its entirety. Because Morales has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), a certificate of appealability will not issue.

SO ORDERED.

Dated: Brooklyn, New York
     August 4, 2015                                 /s/ Judge Raymond J. Dearie

                                                        RAYMOND J. DEARIE
                                                        United States District Judge